STATE OF NORTH CAROLINA WARREN COUNTY IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION
25-CV-XXXXXX-XXX

FILED
DATE: August 27, 2025
TIME: 10:30:38 AM
WARREN COUNTY
CLERK OF SUPERIOR COURT
BY: S. Dale

ANDREW and JENNIFER JOHNSON,

Plaintiffs,

v.

AMERITAS MUTUAL HOLDING COMPANY, AMERITAS LIFE INSURANCE COMPANY, INC., ALLISON TERLIP, AND SEAN ROBERTS,

Defendants.

**COMPLAINT**

**TRIAL BY JURY DEMANDED**

**COMPLAINT**

NOW COME Plaintiffs Andrew Johnson and Jennifer Johnson (collectively "Plaintiffs" or the "Johnsons"), by and through undersigned counsel, and complain of Defendants Ameritas Mutual Holding Company ("AMHC"), Ameritas Life Insurance Company, Inc. ("ALIC"), Allison Terlip ("Terlip"), and Sean Roberts ("Roberts"):

## I. INTRODUCTION

1. This action arises from a sophisticated scheme orchestrated by the Ameritas enterprise to defraud Plaintiffs through the sale of unsuitable equity indexed annuities ("EIAs") while concealing material information about a felonious financial advisor who targeted retired military families with her husband, who has a history of felony charges, including charges involving financial crimes and forgery, through social media platforms.

2. The scheme involved a two-part investment strategy recommendation that violated North Carolina insurance regulations, including but not limited to, 11 NCAC 12.0462, and the common law of North Carolina: first, inducing Plaintiffs to liquidate approximately $926,000 in diversified treasury securities and mutual funds held in their Thrift Savings Plan



Case 5:25-cv-00797-M-RN Document 1-4 Filed 12/09/25 Page 1 of 25
Electronically Filed Date: 8/22/2025 4:07 PM Warren Superior Court County Clerk of Superior Court

("TSP") and Vanguard accounts; second, using those proceeds to purchase three concentrated, illiquid, and unsuitable proprietary EIAs manufactured by ALIC.[1]

3. Central to this fraudulent scheme was Defendants' deliberate concealment of Terlip's March 5, 2023 felony aggravated assault with a deadly weapon charge and her subsequent nolo contendere plea in July 2023 - material information that Defendants knew would have prevented Plaintiffs and other customers from ever doing business with Terlip or the Ameritas enterprise.

4. According to Terlip's publicly available FINRA Broker Check Report, AIC terminated Terlip's securities registration on October 12, 2023. AIC and ALIC correspondence sent to Plaintiffs states that the termination occurred on October 3, 2023. Regardless of the actual date and which one is accurate, Defendants never alerted Plaintiffs about Terlip's

---

[1] Ameritas Investment Company, LLC ("AIC"), a wholly owned subsidiary of Defendant Ameritas Life Insurance Company, Inc. ("ALIC"), is a broker-dealer and FINRA member firm but is not named as a defendant in this action. For clarity, AIC is referred to throughout this Complaint as "AIC." AIC and former AIC registered representative Allison Terlip are respondents in a separate, currently pending FINRA customer arbitration proceeding, *Johnson v. Ameritas Investment Company, LLC and Allison Terlip*, FINRA Case No. 25-01477. That arbitration asserts claims arising from securities sales practice misconduct in connection with AIC's and Terlip's recommendation that Plaintiffs liquidate diversified securities holdings and invest the proceeds in ALIC-issued equity indexed annuities ("EIAs").

By contrast, the present civil action in this Court is directed at different—though factually intertwined—set of misconduct and actors: the insurance sales practices, fraudulent concealment, negligent supervision, and corporate misconduct of the named Defendants, including ALIC, its parent Ameritas Mutual Holding Company ("AMHC") in connection with the marketing and sale of the same EIA products. This lawsuit addresses the broader Ameritas enterprise scheme and "regulatory arbitrage" between its securities and insurance operations, including the decision to retain Terlip as an ALIC insurance agent after her termination by AIC, the failure to disclose her felony charge and nolo contendere plea, and the continuation of the fraudulent two-part investment strategy through ALIC channels to evade FINRA and SEC oversight.

Although the FINRA arbitration and this action share certain underlying transactions and factual predicates, the defendants, legal theories, and regulatory frameworks differ materially. The arbitration is limited to claims against the FINRA-regulated broker-dealer (AIC) and its registered representative (Terlip) for violations of securities industry rules and duties. This action is necessary to pursue relief against the Ameritas insurance entities and individuals for their distinct but interrelated role in enabling and profiting from the fraud through insurance sales channels, integrated corporate governance, and intentional circumvention of securities regulation.

termination by AIC, at any time. Instead, Defendants concealed this fact from Plaintiffs and allowed Terlip to remain an active insurance agent for ALIC and complete the sale of EIAs to Plaintiffs after she had been terminated by AIC. Defendants knowingly acted in concert to conceal from Plaintiffs these material facts about Terlip's felony charge, nolo contendere plea, and AIC termination because Terlip was in the midst of completing the same investment strategy previously recommended to Plaintiffs between September and November 2023 and they did not want to lose Plaintiffs' business, assets, and misplaced trust, in addition to fearing the loss of other retired military officers, like Captain Johnson, whom they reasonably believed would be alerted of these facts by the Plaintiffs (and vice versa with respect to all of the other military officer clients fooled by Terlip, Roberts, and Full Life into entrusting their life savings with them).

5. This case exposes the inherent conflicts and regulatory arbitrage within the Ameritas enterprise's integrated business model, where insurance and securities operations are deliberately intertwined to maximize profits while evading regulatory oversight and enabling bad actors like Terlip and Roberts to prey on retired military families.

## II. PARTIES

7. Plaintiffs Andrew Johnson and Jennifer Johnson are citizens and residents of Virginia who also maintain a residence in North Carolina. Mr. Johnson is a retired U.S. Navy Captain and Iraq combat veteran who served his country with distinction. Mrs. Johnson is a pharmacist.

8. Defendant Ameritas Mutual Holding Company is a Nebraska mutual holding company with its principal place of business at 5900 O Street, Lincoln, Nebraska. AMHC is the parent company of a complex financial services enterprise with over $30.7 billion in assets that

exercises direct control over its subsidiaries through common leadership, centralized compliance, and integrated operations.

9. AMHC's 2023 annual report claims to "put customers first" while its actual conduct demonstrates a pattern of concealing material information about its agents, prioritizing proprietary product sales over customer protection, and enabling fraudulent sales practices targeting vulnerable populations including military veterans.

10. Defendant Ameritas Life Insurance Company is a Nebraska corporation registered to do business in North Carolina with its principal place of business at 5900 O Street, Lincoln, Nebraska. ALIC is a wholly-owned subsidiary of AMHC and the 100% owner of AIC.

11. Defendant Sean Roberts is the former husband of Allison Terlip and a resident of Florida. From June 2022 until at least January 2024, Roberts served as an Ameritas independent contractor and an officer of Full Life Financial Planning with management responsibilities including coordinating EIA sales with Ameritas. Upon information and belief, Roberts and Terlip worked together to handle and facilitate the sale of the Johnson's TSP and Vanguard securities and the purchase of the EIAs for the Johnsons between September 2023 and November 2023.

13. Defendant Allison Terlip is a resident of Florida who, at all relevant times, served as a licensed insurance agent of ALIC and a registered representative of AIC until her termination on October 3, 2023 (or October 12, 2023). Terlip pled nolo contendere to a felony aggravated assault with a deadly weapon charge in July 2023. ALIC retained Terlip so she could continue selling EIAs after her termination by AIC. She directly participated in and profited from the sale of all EIAs to Plaintiffs and other victims, and concealed material information about her criminal history, disciplinary events, and the illiquid, complex nature of the EIAs she sold.

**III. JURISDICTION AND VENUE**

14. Defendants AMHC and ALIC are insurance companies headquartered in Nebraska that market and sell annuity products nationwide, including in North Carolina.

15. Defendant Allison Terlip, at all times relevant, was an authorized agent of AMHC and ALIC. Terlip marketed, solicited, and sold annuity products on their behalf.

16. Defendant Sean Roberts, at all times relevant, was also an authorized agent of AMHC and ALIC, working in concert with Terlip in the marketing and sale of annuity products.

17. The annuity contracts at issue:

- Were issued to North Carolina residents, and list North Carolina customer addresses because Terlip was not licensed in Virginia; and
- In other instances, were physically signed ("wet ink") in both North Carolina and Virginia.

18. Certain related transactions were effectuated by Terlip and Roberts in Florida while acting as agents of AMHC and ALIC, as part of the same fraudulent scheme targeting North Carolina residents.

19. AMHC and ALIC directed, authorized, and benefited from all of the above transactions, deriving substantial revenue from North Carolina customers.

20. Defendants regularly transact insurance business in North Carolina, solicit customers here, and maintain systematic and continuous contacts with this State.

21. This Court has personal jurisdiction over all Defendants pursuant to N.C. Gen. Stat. § 1-75.4 because they have purposefully availed themselves of the privilege of conducting business in North Carolina, maintain systematic and continuous contacts with this State, and committed tortious acts and transactions giving rise to this action in North Carolina.

22. Defendants AMHC and ALIC acted in North Carolina through their authorized agents, Defendants Allison Terlip and Sean Roberts, whose acts are imputed to AMHC and ALIC under settled agency law. Terlip and Roberts marketed, sold, and facilitated annuity contracts to North Carolina residents on behalf of AMHC and ALIC, knowing and intending that such transactions would be performed in substantial part in North Carolina.

23. The annuity contracts at issue list North Carolina customer addresses because Defendant Terlip was not licensed in Virginia. All such acts were performed within the course and scope of Terlip's and Roberts' agency for AMHC and ALIC.

24. Defendants Terlip and Roberts also effectuated related transactions in Florida on behalf of AMHC and ALIC that were part of the same fraudulent scheme targeting North Carolina residents. AMHC and ALIC, while headquartered in Nebraska, directed, authorized, and benefited from these transactions and derived substantial revenue from North Carolina.

25. Venue is proper in Warren County, North Carolina, pursuant to N.C. Gen. Stat. § 1-82, because Defendants regularly conduct business in this County, and a substantial part of the events, transactions, and omissions giving rise to these claims occurred here. These include, without limitation: (a) execution of annuity contracts listing North Carolina addresses; (b) delivery of contract-related services into North Carolina; (c) receipt of payments from North Carolina residents; and (d) communications directed into North Carolina in furtherance of the scheme.

26. Venue is further proper because the wrongful acts of Defendants' agents in North Carolina are attributable to their principals, AMHC and ALIC, making this the most appropriate forum for adjudication.

## IV. FACTUAL ALLEGATIONS

### A. The Ameritas Enterprise's Integrated Business Model Enables Fraud

27. The Ameritas enterprise operates through an intentionally complex corporate structure designed to blur the lines between insurance and securities operations, enabling regulatory arbitrage and maximizing profits while evading oversight.

28. AMHC exercises direct control over both ALIC and AIC through common officers, directors, and centralized compliance functions, creating an integrated enterprise where insurance and securities sales are coordinated to benefit the parent company.

29. This integrated model allows agents like Terlip to wear multiple hats - functioning as both AIC registered representatives subject to SEC and FINRA oversight when convenient, and as ALIC insurance agents subject to less stringent state regulation when beneficial to avoid compliance obligations. This arbitrage has been exploited by Defendants to the detriment of Plaintiffs, forcing them to pursue their "securities" and "deceptive investment strategy recommendation" claims against AIC and Terlip before FINRA's dispute resolution forum while pursuing their deceptive trade practices and insurance related claims her by filing a complaint in North Carolina state court.

### B. Defendants' Negligent Recruitment of Terlip and Full Life Financial

30. In May 2022, AMHC and ALIC recruited and hired Terlip and her company Full Life Financial to join the Ameritas enterprise and AIC despite readily available information that would have raised serious red flags about their fitness to provide financial services, including Terlip's husband, Sean Roberts, who had a known history of criminal charges involving alleged financial crimes and forgery.

31. Full Life Financial was operated by Defendant Terlip and her husband Defendant Roberts, whose extensive criminal history involving numerous charges and allegations of

financial crimes would have and should have been uncovered by Defendants AMHC and ALIC through reasonable due diligence.

32. Defendants AMHC and ALIC either failed to conduct proper background investigations or deliberately ignored clear red flags about Full Life Financial's principals, Terlip and Roberts, establishing a pattern of negligent oversight from the inception of the relationship and nearly six months before Terlip began to groom Plaintiffs with the intention of seizing control of Captain Johnson's TSP via Linkedin in early January 2023.

**C. The Felony Charge and Systematic Cover-Up**

33. On March 5, 2023, Terlip was charged with felony aggravated assault with a deadly weapon in Florida.

34. Terlip had an immediate obligation under FINRA rules, and Florida and North Carolina insurance regulations policies to report this felony charge to regulatory agencies and to the compliance officials AMHC and ALIC responsible for her supervision within specified timeframes.

35. Because Plaintiffs did not learn about Terlip's felony charge until January 2024 through sources other than Defendants, or approximately eight months after her charge, Plaintiffs reasonably believe and allege that Terlip – despite knowing her reporting obligations – intentionally concealed and failed to report her felony charge to them because she knew that they would consider this to be material information important to making a decision regarding whether to entrust her, Full Life, and Roberts with their life savings, and that they would likely take their business elsewhere.

36. Plaintiffs, for the same reasons, reasonably believe and allege that Terlip also intentionally concealed and failed to report her felony charge to AIC's compliance department and AMHC and ALIC management because she feared that she would be terminated.

37. Terlip concealed her felony charge from Plaintiffs and from AMHC, ALIC, and AIC management because she feared that such disclosure would result in losing customers, losing Plaintiffs' trust, and that it would destroy her ability to profit from liquidating their retirement totaling approximately $926,000 and converting these funds into proprietary EIAs manufactured by ALIC.

**D. AIC's Belated Discovery and the Continued Cover-Up by Defendants AMHC, ALIC, Terlip, and Roberts**

38. Terlip's FINRA Broker Check Report disclosed that AIC terminated her on October 12, 2023.

39. Defendants did not disclose this fact to Plaintiffs – ever – they learned about it through other sources in January 2024.

40. Instead of disclosing that AIC terminated Terlip in October 2023, Terlip and Defendants AMHC and ALIC acted like everything was normal. For example, Terlip continued engaging with Plaintiffs using emails that stated she still acted as an AIC financial advisor and that she sold securities through Ameritas Investment Company even though Defendants knew this was false. Terlip continued sending these emails to Plaintiffs through January 2024 – the entire time during which she orchestrated her fraud to induce Plaintiffs to liquidate their retirement savings in the TSP and at Vanguard and invest the proceeds into three EIAs manufactured by ALIC. Terlip's deceptive use of email to fool customers like Plaintiffs into believing that she remained an AIC financial advisor was enabled, aided and abetted by AMHC's

and ALIC's failed systems of supervision that apparently did not identify or resolve this false and ongoing representation made by one of its insurance agents that ALIC evidently chose to retain after AIC chose to terminate her.

41. That Terlip was able to continue holding herself out as an AIC financial advisor for months after AIC terminated her is evidence of AMHC and ALIC's deficient and failed supervision of an agent who they knew or should have known had been charged with a felony and who they knew or should have known had been terminated by AIC.

42. And throughout the Fall of 2023 (October – November 2023), Terlip worked closely with her husband, Sean Roberts, to facilitate the transfer of Plaintiffs' life savings for the purpose of purchasing the three EIAs – Roberts is featured on numerous emails with Plaintiffs throughout this period and based on those communications it appears that Roberts was integral in facilitating and supporting all aspects of Terlip's fraud against Plaintiffs. Indeed, based on the communications between Terlip, Roberts, and Plaintiffs during this time, some would use the phrase that Terlip and Roberts were "two peas in a pod" given how favorably Terlip spoke of Roberts and closely they coordinated in defrauding Plaintiffs.

43. More specifically, during this time (September – November 2023), Terlip referred to Roberts as her husband and joked about him affectionately in various text messages that she sent to Plaintiffs. She even texted Plaintiffs messages containing photographs of the two of them vacationing together in a mountain cabin located in North Carolina.

44. Through the knowing and willful concealment of the felony charge and the affirmative acts that she took to fool Plaintiffs into believing that she lived a completely normal life and had a completely ordinary marriage and a successful career as an AIC financial advisor

and an ALIC insurance representative, Terlip achieved the objective of her deception: Plaintiffs entrusted their life savings to her and invested $926,000 into three EIAs manufactured by ALIC.

**E. The Fraudulent Two-Part Investment Strategy Targeting the Johnsons**

45. Specifically, in June 2023, while concealing her felony charge and ongoing criminal proceedings, Terlip contacted Plaintiffs through LinkedIn, email, and off-channel text messaging (itself a violation of FINRA rules and Ameritas policies and procedures) using marketing materials specifically designed by her husband Sean Roberts to target retired military officers.

46. Terlip, presenting herself as a trustworthy financial advisor with expertise serving the military community through her role as CEO of Full Life Financial, began cultivating a relationship of trust with the Johnsons.

47. Between June and October 2023, Terlip, acting within the scope of her authority as an AIC registered representative and ALIC insurance agent, recommended a two-part investment strategy to the Johnsons which she knew or should have known violated SEC Reg Best Interest and North Carolina's model insurance laws requiring insurance recommendations to be in the best interest of customers.

48. The first part of this strategy involved liquidating the Johnsons' entire diversified portfolio of treasury securities held in Mr. Johnson's TSP account and mutual funds held in Vanguard accounts - conservative investments that were well-suited to the Johnsons' risk tolerance and retirement planning needs. Terlip acted together with her husband, Roberts, to accomplish the liquidation of Plaintiffs' retirement investments between October and November 2023.

49. The second part involved Terlip and Roberts acting in concert to transfer the proceeds using ALIC and AMHC systems to purchase three concentrated positions in proprietary ALIC-manufactured EIAs, complex products with lengthy surrender periods, substantial penalties for early withdrawal, opaque fee structures, and risks entirely unsuitable for the Johnsons' stated need for liquidity and conservative investment approach.

50. Throughout this process, Terlip made numerous material misrepresentations and omissions, including:

a. Failing to disclose her March 2023 felony charge for aggravated assault with a deadly weapon;

b. Failing to disclose her July 2023 nolo contendere plea;

c. Failing to disclose multiple civil judgments and financial problems demonstrating her unfitness;

d. Misrepresenting that EIAs provided "market participation" when they do not;

e. Concealing the true nature of surrender charges and liquidity restrictions;

f. Falsely claiming the EIAs were suitable replacements for treasury securities and mutual funds;

g. Failing to disclose the enormous commissions she would earn from these sales.

51. The systematic nature of Defendants' (Terlip, Roberts, AMHC, and ALIC collectively) fraud is evidenced by the inconsistent and erroneous information on various "Indexed Annuity Disclosure" forms Terlip completed:

a. The September 19, 2023 form states the EIA represents 21.05% of household net worth;

b. The September 20, 2023 form states annuities represent only 2.14% of net worth;

c. The October 13, 2023 form states annuities represent 29.21% of net worth;

d. These material inconsistencies demonstrate both Terlip's lack of understanding of the products she was selling and the corresponding failure by AMHC, ALIC, and AIC to properly supervise these transactions.

**F. The October 2023 Transactions and Continued Deception**

52. According to official correspondence sent to Plaintiffs in the Spring of 2024 responding to their complaints, on October 3, 2023, AIC formally terminated its relationship with Terlip. However, Terlip, AIC, ALIC, and AMHC each failed to inform the Plaintiffs of this fact in October 2023 and afterwards even though these Defendants all knew or should have known it would have been important to Plaintiffs in making an informed decision to entrust their life savings to Terlip and Roberts, as well as to ALIC and AMHC.

53. According to her FINRA Broker Check profile, AIC terminated Terlip's registration on October 12, 2023 (10 days after AIC's other records indicate that it terminated her registration).

54. While two of the three EIA transactions had their inception with the execution of annuity disclosure form records signed by Plaintiffs on September 19 and 20, the third EIA annuity disclosure form (an AIC record used to sell an ALIC product – another instance evidencing Defendants' regulatory arbitrage), one day later on October 13, 2023, Defendants facilitated Terlip's completion of the third EIA purchase contemplating the remainder of Plaintiffs' life savings ($409,700 according to this form), while Terlip continued to conceal her termination and instead falsely present herself as an AIC registered representative in order to consummate her deceptive plan and lock up Plaintiffs' liquid retirement savings into the three illiquid, complex, and completely unsuitable EIAs pushed by Terlip and manufactured by ALIC.

55. AMHC and ALIC designed and facilitated the October 13 transaction structure – and all subsequent transactions between October and November 2023 necessary to enable the liquidation of Plaintiffs retirement investments and life savings to purchase the three EIAs – was deliberately designed by Terlip, Roberts, ALIC, and AMHC to evade regulatory oversight.

56. While Terlip was no longer technically registered with AIC she concealed this fact from Plaintiffs to avoid making them suspicious or losing their trust and business, while benefiting from the fact that ALIC chose to retain her as an insurance agent, allowing Terlip and the Ameritas enterprise to claim the EIA sales were purely insurance related transactions not subject to SEC or FINRA oversight – notwithstanding the fact that their purchase was only possible through the sale of securities and were otherwise part of Terlip's deceptive investment strategy recommendation, which is clearly subject to FINRA and SEC oversight.

57. After the EIA purchases were completed, Terlip continued to deceive the Johnsons about their investments, providing various false excuses for delays in accessing their funds including fabricated IT issues, health problems, natural disasters, and federal holidays – this fraud and deception occurred between November 2023 and January 2024 until the Johnson's discovered her fraud and began complaining to Ameritas executives.

**G. Regulatory Arbitrage and Supervisory Failures**

58. The Ameritas enterprise's business model exemplifies regulatory arbitrage - exploiting gaps between securities and insurance regulation to maximize profits while avoiding oversight.

59. When it benefits the enterprise, agents like Terlip are presented as registered representatives subject to SEC and FINRA oversight; when compliance becomes inconvenient, they suddenly become insurance agents subject only to state regulation. Defendants specifically

exploited these ambiguities in disclaiming responsibility for the X711 indexed annuity transaction because Defendants allege that these X711 Ameritas forms were executed by Plaintiffs on October 13 and afterwards, which was after AIC terminated Terlip even though all Defendants and AIC knew or should have known that Terlip continued to hold herself out to Plaintiffs as an AIC investment advisor representative and financial advisor employed and otherwise contracted with AIC and subject to AIC supervision.

60. This arbitrage is evidenced by AIC's shocking admission to Plaintiffs that it had no obligation to review the X711 October 13, 2023 EIA transaction because Terlip had been terminated as a registered representative the day before - despite AIC knowing that this third EIA (X711) was one part of the same investment strategy recommendation AIC supervised and approved in September 2023.

61. The supervisory failures cascade throughout the enterprise and were incentivized by a business model that prioritized sales of EIAs to unsuspecting retired military veterans over compliance with securities and insurance regulations, in addition to North Carolina law: a) ALIC failed to protect customers by retaining a person who was charged with a violent felony to which she pled nolo contendere as an agent; and b) AMHC failed to coordinate compliance across its subsidiaries.

**H. Discovery of the Fraud and Continued Harm**

62. In January 2024, after months of evasion and excuses from Terlip, Plaintiffs began to suspect something was wrong with their investments and attempted to exercise their rights during what they believed was a "free look" period.

63. Only through their own investigation did the Plaintiffs discover Terlip's criminal history, her termination by AIC, and the true nature of the unsuitable investments they had been

sold. Defendants knowingly and intentionally concealed these facts from Plaintiffs to prevent them from complaining in a timely manner, to induce them to invest with Terlip, Roberts, and Full Life Financial, and to use their life savings to purchase unsuitable, complex, EIAs manufactured by ALIC.

65. When the Plaintiffs complained to Ameritas executives and compliance officials, they were met with gaslighting, blame-shifting, and false statements that continue to this day, including what they believe has been misleading information provided to regulators investigating these matters. As just one example, Ameritas compliance professional Emmett Holloway presented Plaintiffs in February 2024 with a DocuSign annuity contract associated with Envelope ID 98863DDB-BF22-42E6-83F0-2E41FFBF228A and EIA Contract No. X711, insisting it was valid and binding. However, DocuSign Customer Support later confirmed on August 21, 2025 that this envelope had been officially voided, that all associated signatures were invalid, and that the document could never be recognized as a completed transaction under any circumstances. Despite this, Ameritas continued to represent the voided contract as legitimate "proof" of Plaintiffs' annuity purchase, exemplifying the company's broader pattern of intentional concealment of material facts, manipulating records, gaslighting, and misrepresenting the status of Plaintiffs' investments in order to preserve fraudulent sales and mislead Plaintiffs and regulators.

66. As a direct result of Defendants' fraudulent scheme, Plaintiffs' retirement savings that were invested in liquid TSP and Vanguard securities accounts now remain trapped in unsuitable, illiquid EIAs, hybrid complex products that are sometimes classified as securities and sometime classified as insurance, but which always have substantial surrender charges and inscrutable terms and conditions (which were not provided to Plaintiffs before purchase or even within the

free look period notwithstanding Defendants claims to the contrary), while Defendants collected enormous commissions and fees.

## V. LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF

**(Fraud - Against All Defendants)**

67. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

68. Defendants made material misrepresentations and omissions to Plaintiffs including but not limited to:

a. Concealing Terlip's March 2023 felony charge and July 2023 nolo contendere plea;

b. Concealing multiple civil judgments against Terlip and Roberts;

c. Misrepresenting the nature, risks, and suitability of the EIAs;

d. Concealing AIC's termination of Terlip;

e. Misrepresenting Terlip's status and authority after October 3, 2023;

f. Concealing conflicts of interest and excessive commissions;

g. Misrepresenting the liquidity and accessibility of the EIA investments.

69. These misrepresentations and omissions were made with scienter - Defendants knew they were false or recklessly disregarded their truth.

70. The misrepresentations and omissions were made to induce Plaintiffs to liquidate suitable investments and purchase unsuitable EIAs.

71. Plaintiffs reasonably relied on these misrepresentations and omissions to their detriment.

72. But for Defendants' fraud, Plaintiffs would not have liquidated their retirement accounts or purchased the EIAs.

73. Defendants' conduct was willful, wanton, malicious, and undertaken in bad faith, warranting punitive damages.

## SECOND CLAIM FOR RELIEF

**(Breach of Fiduciary Duty – Against All Defendants)**

74. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

75. As insurance agents subject to North Carolina's "Suitability in Annuity Transactions" regulation, 11 NCAC 12.0462, and/or by virtue of the relationship of trust and confidence established with Plaintiffs, Defendants owed fiduciary duties to Plaintiffs.

76. North Carolina law, including, 11 NCAC 12.0462, establishes independent standards of care and fiduciary obligations owed by insurance agents when making investment recommendations, including duties of care, disclosure, conflict management, and compliance, and requires that such recommendations be made in the customer's best interest.

77. North Carolina's 11 NCAC 12.0462 imposes a "best interest" standard of conduct on insurance agents, producers and insurers recommending annuities, requiring them to:

- Exercise reasonable diligence, care, and skill in making recommendations ("Care Obligation");
- Provide clear and accurate disclosure of material facts, product features, and conflicts of interest ("Disclosure Obligation");
- Identify and avoid or reasonably manage conflicts of interest ("Conflict of Interest Obligation"); and
- Establish and maintain policies and procedures to ensure compliance ("Compliance Obligation").

78. North Carolina regulatory standards collectively establish the minimum standard of care and help define the fiduciary duties owed by registered representatives, insurance producers, and their firms to retail customers in North Carolina and nationwide.

79. All Defendants, through their participation in and facilitation of the investment strategy recommendation and related conduct, assumed and breached fiduciary duties by violating the regulations itemized herein.

80. These breaches of fiduciary duty, defined and evidenced by violations of North Carolina common law and 11 NCAC 12.0462, directly and proximately caused Plaintiffs' damages.

## THIRD CLAIM FOR RELIEF

**(Constructive Fraud - Against All Defendants)**

85. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

86. Defendants maintained a relationship of trust and confidence with Plaintiffs.

87. Defendants took advantage of this relationship to benefit themselves at Plaintiffs' expense.

88. Defendants' conduct constitutes constructive fraud under North Carolina law.

89. Plaintiffs were damaged as a direct and proximate result.

## FOURTH CLAIM FOR RELIEF

**(Negligent Supervision - Against AMHC, ALIC, and Terlip)**

90. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

91. The entity Defendants owed duties to properly supervise Terlip and Roberts, and Terlip had an equally important, material, legal duty to supervise Roberts, including:

a. Conducting adequate background investigations before hiring;

b. Reporting known criminal charges to appropriate compliance personnel;

c. Protecting customers from known bad actors;

d. Actually monitoring activities of supervised persons;

e. Preventing supervised persons from engaging in fraudulent conduct.

92. Defendants breached these duties through systematic failures including:

a. Systemic and ongoing failures to report Terlip's felony charge to Plaintiffs, to AIC compliance, and to other leaders within the AMHC corporate enterprise;

b. AMHC and ALIC's failure to coordinate compliance across subsidiaries;

e. AMHC and ALIC permitting or failing to prevent Terlip to deceive Plaintiffs through her ongoing deceptive and false representations that she was and remained an AIC representative after being terminated and knowing this was not true.

93. These supervisory failures directly enabled the fraud that harmed Plaintiffs.

**FIFTH CLAIM FOR RELIEF**

**(Civil Conspiracy - Against All Defendants)**

94. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

95. Defendants formed agreements and knowingly acted together and conspired to:

a. Conceal Terlip's criminal history from customers and regulators causing customer harm to the Plaintiffs;

b. Structure transactions to evade regulatory oversight causing customer harm to the Plaintiffs;

c. Maintain Terlip's ability to sell EIAs despite her unfitness causing customer harm to the Plaintiffs;

d. Mislead regulators investigating customer complaints thereby causing customer harm to the Plaintiffs.

96. Each Defendant committed overt acts in furtherance of the conspiracy.

97. The conspiracy directly caused Plaintiffs' damages.

**SIXTH CLAIM FOR RELIEF**

**(Unfair and Deceptive Trade Practices - Against All Defendants)**

98. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

99. Defendants' conduct constitutes unfair and deceptive trade practices under N.C.G.S. § 75-1.1.

100. The conduct occurred in or affected commerce in North Carolina.

101. Defendants' violations were willful and knowing, entitling Plaintiffs to treble damages.

**SEVENTH CLAIM FOR RELIEF**

**(*Respondeat Superior* - Against AMHC and ALIC)**

102. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

103. At all relevant times, Terlip and Roberts were acting as agents, independent contractors, or apparent agents of the entity Defendants.

104. The individual Defendants' tortious conduct was within the scope of their agency or employment.

105. The entity Defendants are vicariously liable for their agents' misconduct.

**EIGHTH CLAIM FOR RELIEF**

**(Negligence & Negligence *Per Se*- Against All Defendants)**

106. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

107. Defendants owed duties of reasonable care to Plaintiffs in connection with investment recommendations and the supervision of investment professionals.

108. The standard of reasonable care applicable to Defendants' conduct is established by North Carolina's 11 NCAC 12.0462, which imposes best-interest, care, disclosure, conflict management, and compliance obligations in the sale and recommendation of annuities.

109. The duties set forth in 11 NCAC 12 0462 were enacted and promulgated for the protection of a specific class of persons - namely, retail consumers of annuity and insurance products in North Carolina — against the very type of harm suffered by Plaintiffs. Plaintiffs are members of this protected class.

110. The harm suffered by Plaintiffs — including losses resulting from unsuitable and conflicted insurance product recommendations, concealment of material information, and failure to supervise — are of the precise type that 11 NCAC 12.0462 were designed to prevent.

111. Defendants' violations of 11 NCAC 12.0462 constitute negligence *per se* under North Carolina law because:

- Each imposes an affirmative duty on insurance producers to act in the consumer's best interest and to exercise reasonable diligence, care, and skill;
- Each is intended to protect consumers from economic harm caused by unsuitable or conflicted insurance recommendations; and
- Plaintiffs' injuries were the natural and proximate result of Defendants' violations.

112. These standards require, at a minimum:

- Making insurance recommendations in customers' best interest;
- Exercising reasonable diligence, care, and skill in understanding insurance product recommendation risks and rewards;

- Having a reasonable basis to believe recommendations are suitable;
- Providing full and fair disclosure of material facts and conflicts;
- Establishing and maintaining supervisory systems;
- Ensuring compliance with applicable regulations.

113. A reasonable insurance agent and insurance company operating under these established standards would have:

- Disclosed Terlip's felony charge and criminal proceedings to customers;
- Reported known criminal charges to compliance departments;
- Prevented a person with undisclosed criminal charges from making insurance recommendations;
- Recognized that liquidating conservative investments to purchase and overconcentrate the proceeds into illiquid EIAs violated 11 NCAC 12 0462;
- Supervised insurance recommendations to ensure compliance with applicable standards; and
- Protected customers from known bad actors.

114. Defendants breached the applicable standard of care by:

- Failing to comply with and 11 NCAC 12.0462;
- Concealing material information about Terlip's criminal history;
- Failing to report known criminal charges to appropriate compliance personnel;
- Allowing unsuitable insurance recommendations in violation of established standards;
- Failing to supervise in accordance with industry standards and regulations;
- Enabling continued fraudulent conduct after discovering violations.

115. Defendants knew or should have known that their failure to comply with 11 NCAC 12 0462 would result in customer harm.

116. Defendants' negligence, including negligence per se based on violations of these federal and state regulatory standards, proximately caused Plaintiffs' damages.

**NINTH CLAIM FOR RELIEF**

**(Breach of Contract - Against AMHC and ALIC)**

117. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

118. Plaintiffs had contractual relationships with these Defendants requiring suitable investment advice and fair dealing.

112. Defendants breached these contracts through the conduct described herein.

113. Plaintiffs were damaged as a direct result.

## VI. DAMAGES

118. As a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered damages in an amount to be proven at trial, but at this time are reasonably calculated to include, without limitation:

a. Loss of access to approximately $926,000 in retirement savings now trapped in illiquida EIAs;

b. Surrender charges and penalties preventing access to their funds;

c. Excessive fees, commissions, and ongoing charges;

d. Lost investment returns from suitable investments they would have and which they otherwise could have maintained but for the misconduct, fraud, and wrongdoing alleged herein;

e. Tax consequences from unnecessary liquidations;

f. Emotional distress, mental anguish, and anxiety regarding retirement security;

g. Costs and expenses incurred in attempting to mitigate and remediate Defendants' misconduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

1. Award compensatory damages in an amount to be proven at trial, but no less than $926,000;

2. Award punitive damages in an amount sufficient to punish Defendants and deter similar conduct;

3. Award treble damages pursuant to N.C.G.S. § 75-16;

4. Order rescission of the three EIA contracts and restoration of Plaintiffs' funds;

5. Order disgorgement of all ill-gotten gains including commissions and fees;

6. Award pre- and post-judgment interest at the maximum legal rate;

7. Award Plaintiffs their costs and reasonable attorneys' fees;

8. Grant trial by jury on all issues so triable;

9. Grant such other and further relief as the Court deems just and proper.

DATE: August 22, 2025

Respectfully submitted,

**/s/ Demian J. Betz**

Demian J. Betz, Esq.
N.C. State Bar No. 57639
**BETZ LAW, PLLC**
615 South College Street, 9th Floor
Charlotte, NC 28202
Telephone: 704-343-1546
E-Mail: demian@betzlawpllc.com
Attorney for Plaintiffs Captain Andrew Johnson
and Jennifer Johnson